[No. B014129. Second Dist., Div. Seven. Nov. 7, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS TALLAGUA, Defendant and Appellant.

In re THOMAS TALLAGUA on Habeas Corpus.

**COUNSEL**

Potter & Cohen and Paul E. Potter for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Carol Wendelin Pollack and Robert D. Breton, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—Thomas Tallagua, a former deputy sheriff, appeals from his conviction for giving perjured testimony during a preliminary hearing. He also petitions for a writ of habeas corpus. We ordered the petition be considered along with the appeal. For the reasons set forth below we affirm the conviction and deny the petition for writ of habeas corpus.

FACTS AND PROCEEDINGS BELOW

Tallagua and his partner, Deputy Alvarez, were on patrol when they were flagged down by Christina Montoya. Ms. Montoya told the deputies her common law husband, Harold Howard, had come home drunk, was acting violently and was armed with a knife. She also told them Mr. Howard had recently been released from Soledad prison.

The deputies called for a backup unit and then drove a short distance to Ms. Montoya's home. When the backup unit arrived, Tallagua, Deputy Alvarez, one of the backup deputies and Ms. Montoya entered Ms. Montoya's home. Inside they found Mr. Howard sitting on a couch quietly watching television. A jacket was on the couch next to Mr. Howard.

Deputy Alvarez ordered Mr. Howard to stand up. He then searched Mr. Howard but found nothing. Next, Deputy Alvarez searched the jacket on the couch and found a handgun. Deputy Alvarez told Mr. Howard he was under arrest for a violation of Penal Code section 647, subdivision (f) (public intoxication) and, possibly, unlawful possession of a handgun by an ex-felon.

In an apparent effort to validate the arrest for public intoxication inside a private home and the search of the jacket which preceded the arrest, Tallagua falsified the arrest report. He wrote Mr. Howard had been outside the house when he and Deputy Alvarez arrived and that Mr. Howard had been arrested outside, rather than inside, the house. Tallagua also wrote the handgun had been found in the pocket of a jacket Mr. Howard had been wearing at the time of the arrest.

Deputy Alvarez read the arrest report for the first time while awaiting his turn to testify at Mr. Howard's preliminary hearing on the gun charge. He knew the report was false and, at that very moment, his partner, Tallagua, was inside the courtroom giving perjured testimony in accordance with the false arrest report. Deputy Alvarez had two choices: he could expose his partner's lies or he could corroborate them. He chose to commit perjury, too.

Shortly after returning to his station after testifying in the Howard matter, Deputy Alvarez confessed the perjury to another deputy. Following an internal investigation by the sheriff's department perjury charges were filed against Tallagua and Deputy Alvarez. Subsequently, the charge against Deputy Alvarez was dismissed on motion by the People. The case against Tallagua proceeded to trial.

Tallagua was represented at pretrial proceedings and trial by an attorney furnished him by the Association for Los Angeles Deputy Sheriffs pursuant

to Tallagua's membership rights. During the course of the proceedings a dispute existed between the association and Tallagua's attorney over fees due the attorney from the association including fees due on Tallagua's case. Tallagua's attorney advised the court of this dispute but no hearing was held into a possible conflict of interest between Tallagua and his attorney.

After a court trial, Tallagua was found guilty of one count of perjury and sentenced to two years in state prison; probation was denied. Four issues are presented in this appeal.

1. Did the trial court err in not investigating a possible conflict of interest between defendant and his attorney?

2. Was defendant denied effective assistance of counsel at trial?

3. Does the failure to provide defendant procedural protection comparable to that provided persons accused of welfare fraud deny defendant the equal protection of the law?

4. Was there substantial evidence to support defendant's conviction for perjury?

## DISCUSSION

### I. No CONFLICT OF INTEREST WAS PRESENTED TO THE COURT REQUIRING INVESTIGATION

On appeal and in his petition for writ of habeas corpus defendant asserts there was a conflict of interest between him and his trial counsel over payment for his counsel's services. ■ Defendant contends the trial court was aware of this conflict and had a duty to inquire into the matter to determine if the conflict deprived him of effective representation. (See *In re Darr* (1983) 143 Cal.App.3d 500 [191 Cal.Rptr. 882], and cases cited therein.)

Prior to commencement of trial, defendant's counsel filed a document entitled "Notice of Possible Potential Conflict of Interest by Attorneys for Defendant." In that document, defendant's counsel explained he had been jointly retained by defendant and the Association for Los Angeles Deputy Sheriffs. The association had failed to pay counsel fees owed to him and counsel was contemplating suing the association and defendant for his fees.[1] Counsel noted he was financially unable to meet his law office obligations without immediate payment of the fees owed. The notice concluded: "In

---

[1] The amount owed on defendant's account was $225. The total amount owed by the association was $22,331.50.

the event of legal action during the course of this trial, that action may give rise to a possible potential conflict of interest situation. And if and when that situation arises, the undersigned is willing and able to take any reasonable steps to avoid any prejudice to the rights of the defendant or any party to this action and/or to the court's duty in the due administration of justice."

We find the possibility of a conflict of interest was not sufficiently apparent to impose upon the court a duty to inquire further. (See *Wood* v. *Georgia* (1981) 450 U.S. 261, 272 [67 L.Ed.2d 220, 230, 101 S.Ct. 1097].) Defense counsel, out of a commendable sense of duty, was informing the court a conflict of interest might develop during the course of the trial. (See *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, 620, fn. 12 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333].) At the time counsel filed his "notice" there was no actual conflict of interest; there was at most a potential conflict which might or might not develop into an actual conflict. Counsel undertook to advise the court if legal action against the association or the defendant was commenced during the trial. Given counsel's representations, further inquiry by the court was unnecessary.[2]

## II. Defendant Received Effective Assistance of Counsel

Defendant's claim his counsel was ineffective is based primarily on the contention his counsel botched his discriminatory enforcement defense. This defense was doomed from the beginning. It was totally lacking in substance, frivolous, and no amount of discovery or legal erudition could have saved it.[3]

■ If an individual can show he would not have been prosecuted except for invidious discrimination against him, a basic constitutional principle has been violated. (*Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 290 [124 Cal.Rptr. 204, 540 P.2d 44]; and see *Wayte* v. *United States* (1985) — U.S. —, — [84 L.Ed.2d 547, 556, 105 S.Ct. 1524].) On the other hand, it is not a denial of equal protection that one guilty person is prosecuted while others equally guilty are not. (*People* v. *Oreck* (1946) 74 Cal.App.2d 215, 222 [168 P.2d 186]; *People* v. *Serrata* (1976) 62 Cal.App.3d 9, 24 [133 Cal.Rptr. 144, 84 A.L.R.3d 952].)

Defendant's discriminatory enforcement argument is based on the fact both he and Deputy Alvarez lied under oath about the circumstances of Mr.

---

[2]Counsel's statement he was financially unable to meet his law office obligations without immediate payment of the fees owed goes to the adequacy of representation, not conflict of interest. (See discussion, *supra*.)

[3]For this reason, defendant's counsel's failure to conduct discovery, whether for lack of money or some other reason, had no bearing on defendant's conviction.

Howard's arrest, but the charges against Deputy Alvarez were dismissed. Unlike the cases cited by defendant, there is no indication in this case of a pattern of discriminatory enforcement based on race (*Griffin* v. *Municipal Court* (1977) 20 Cal.3d 300 [142 Cal.Rptr. 286, 571 P.2d 997]); sex (*People* v. *Municipal Court (Street)* (1979) 89 Cal.App.3d 739 [153 Cal.Rptr. 69]); political views (*Bortin* v. *Superior Court* (1976) 64 Cal.App.3d 873 [135 Cal.Rptr. 30]) or association (*Murgia* v. *Municipal Court, supra,* 15 Cal.3d 286).[4]

The simple fact, which defendant refuses to acknowledge, is that he was an unrepentant perjurer while his partner, Alvarez, also a perjurer, had the fortitude to come forward immediately after his testimony, admit his lies and expose defendant's. There was nothing sinister or invidious behind the decision to dismiss the charges against Deputy Alvarez and prosecute defendant. Obviously it was in the best interests of the sheriff, the court and the People of this state to encourage law enforcement officers to admit mistakes, to expose corruption in their ranks and to put the public good before their personal interests. Dismissing the charges against Deputy Alvarez was clearly consistent with the promotion of these interests. Treating Deputy Alvarez the same as defendant would have been antithetical to the public interest. It would have sent an unmistakable message to law enforcement officers that there is nothing to be gained and much to be lost by exposing the perjured testimony of a fellow officer. The extent of police perjury and the means to combat it have received little attention. (But see Sevilla, *The Exclusionary Rule and Police Perjury* (1974) 11 San Diego L. Rev. 839.) Nevertheless no other combination of crime and offender poses a greater threat to the integrity of the rule of law by which we must all be bound if we are to survive as a society. To discourage police perjury and to encourage its being reported when it occurs, the district attorney made the correct decision in the case before us.

III. The Absence of Procedural Protection Comparable to That Afforded Persons Accused of Welfare Fraud Does Not Deny Defendant Equal Protection of the Law

█ Before a person accused of welfare fraud may be prosecuted under either Penal Code section 118 or Welfare and Institutions Code section 11483, an effort to obtain restitution must be made. (*People* v. *McGee* (1977) 19 Cal.3d 948, 965-966 [140 Cal.Rptr. 657, 568 P.2d 382]; *People* v. *Jenkins* (1980) 28 Cal.3d 494, 509 [170 Cal.Rptr. 1, 620 P.2d 587].) Because an effort to obtain recantation is not mandated in the case of one

---

[4]We note both deputies had Spanish surnames, both were male, both were of the same rank.

accused of testimonial perjury, defendant claims he is denied equal protection.

It is important to understand restitution, in the case of welfare fraud, is *not* a defense to a criminal prosecution. (*People* v. *McGee, supra,* 19 Cal.3d at p. 960.) Neither is recantation a defense in the case of testimonial perjury. (*People* v. *Baranov* (1962) 201 Cal.App.2d 52 [19 Cal.Rptr. 866].) In either case, the accused is free to come forward and make restitution or retract the false statement. The distinction between welfare fraud and other cases of perjury is that in the former welfare officials are mandated by statute to seek restitution before filing criminal charges. (*People* v. *McGee, supra.*) But no statute mandates any public official to seek retraction before filing criminal charges in other perjury cases.

We find no denial of equal protection in this statutory scheme.

"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549], italics in original.) It requires no citation of authority to argue that welfare applicants who commit fraud "simply to obtain foodstuffs and [other] necessities" (*People* v. *McGee, supra,* 19 Cal.3d at p. 965) and persons accused of committing perjury while testifying in criminal proceedings against another individual are not similarly situated.

Furthermore, although the legislation requiring a prior attempt at restitution was partly "designed to provide at least some modicum of protection to individuals accused of welfare fraud" by allowing them "to make restitution and, thereby, possibly obtain favorable consideration by the prosecuting authorities" (*People* v. *McGee, supra,* 19 Cal.3d 948, 963-965), it was also designed to provide a financial benefit to the state (*id.,* at p. 963); an objective which the retraction of perjured testimony in a criminal trial could never accomplish.

IV. THERE WAS SUBSTANTIAL EVIDENCE TO SUPPORT TALLAGUA'S CONVICTION FOR PERJURY

■ The sufficiency of the evidence to establish perjury is governed by the provisions of Penal Code section 1103a which require perjury must be proved by the testimony of at least two witnesses or of one witness and corroborating circumstances.

It is undisputed Deputies Tallagua and Alvarez were on patrol the night of February 13 when they were flagged down by Ms. Montoya. Ms. Mon-

toya told the deputies Harold Howard, with whom she lived, was drunk and acting violently. The deputies accompanied Ms. Montoya to her home.

At the preliminary hearing in the case of People v. Howard, defendant testified as to what happened after he and Deputy Alvarez arrived at the Howard/Montoya home. (The italicized answers were the basis for the perjury conviction.)

"BY MISS THURMAN: Q. Which location did you go to?

"A. To the defendant's and informant's residence, which was 1735 North Eastern Avenue.

"Q. Did you encounter anyone at that address?

"A. Yes.

"Q. Who was that?

"A. The defendant.

"Q. What condition was the defendant in?

"A. In a drunken condition.

"Q. What did you proceed to do at that time, if anything?

"A. *My partner and I exited our patrol vehicle and approached the defendant who was now by the side entrance to the residence.* . . .

"Q. What did you do after you saw the defendant at the side entrance?

"A. *We approached him and conducted a pat-down search for weapons.*

"Q. Did you observe any weapons after the pat-down?

"A. *Yes. My partner, Deputy Alvarez, found a small revolver, .22.*

" . . . . . . . . . . . . . . . . . . . .

"Q. Were you ever in Mr. Howard's home? . . .

"A. Yes.

"Q. When was that?

"A. *After we placed him under arrest.*"

Tallagua's first assertion, that he and his partner, Alvarez, approached Howard outside his residence, conducted a pat-down search and found a gun was contradicted by Alvarez, Ms. Montoya and Deputy Rivera who arrived on the scene as a backup officer.

Tallagua's testimony Howard was arrested outside the residence is contradicted by Alvarez and corroborating circumstances. Those circumstances are (1) the testimony of Ms. Montoya and Deputy Rivera that when they arrived at the scene Mr. Howard was inside the residence; (2) the gun was found inside the residence; and (3) Mr. Howard was handcuffed inside the residence.

## DISPOSITION

The judgment is affirmed. The petition for writ of habeas corpus is denied.

Lillie, P. J., and Thompson, J., concurred.